IN THE
UNITED STATES DISTRICT
FOR THE DISTRICT OF ARIZONA

CV-19-02887-PHX-ROS(ESW)

IN RE: RAY MAURICE BROWN

FILED MAY 0 6 2019 CLERK U S DISTRICT COURT DISTRICT OF ARIZONA

ON PETITION FOR WRIT OF MANDAMUS
TO THE ATTORNEY GENERAL OF THE STATE OF ARIZONA
CASE NO. CR. 96-11821

COMES NOW RAY MAURICE BROWN IN PRO SE, IN NECESSITY, and hereby invokes this Court's jurisdiction pursuant to the All Writs Act, 28 U.S.C. section 1651 to issue a writ of mandamus, ordering or directing the Attorney General of the State of Arizona or his officers to perform a duty to [CORRECT] all perjury or false-sworn testimony given CASE NO. CR. 96-11821 to effect a showing of ACTUAL INNOCENCE.

The petitioner hereby submits the following [counts] of perjury or false sworn testimony to be CORRECTED:

COUNT (1.)

Shristen Morden (hereinafter Morden) (a Maricopa County prosecutor) with Nancy Darwin (hereinafter Darwin) (a Phoenix police detective) interjected perjury during a Grand Jury proceeding in this matter and created false evidence through false sworn testimony as a

1. material fact or truth to establish probable cause that the
2. petitioner committed the crimes against a complaining
3. witness Cremella Thorton (hereinafter Thorton)
4.
5. FACTS:
6. Darwin was investigating two accusations of rape
7. made against the petitioner by Thorton and a Shamika
8. Jackson (hereinafter Jackson). Regarding Thorton which is
9. relevant in the perjury committed in the grand-
10. jury proceedings. Is that Thorton proffered
11. incriminating evidence of a "scar" as having been shown
12. to her by the petitioner as "proof" of her "story" of having
13. been raped by the petitioner. Accordingly — Thorton
14. had stated to police that during the first consumated
15. act of sexual intercourse she told the petitioner she
16. did not want to get pregnant and at this point stated
17. the petitioner told her he was "fixed", removed his
18. penis from her vagina, turned on the lights and show-
19. ed her a scar on his lower stomach just above his
20. penis, which was "slanted", "4½ to 5 inches in
21. length", and "white in color", (see Exhibit (A)[which
22. is the description Thorton gave to police]. During
23. an interrogation concerning this issue the
24. petitioner was asked by a detective Mark Calles
25. (hereinafter Calles) to view that area where the
26. scar was located as proffered by Thorton; At
27. this time Darwin was in another room monitoring
28. the audio-visual transactions between Calles

1  and the petitioner (see R.T. dated 10-28-98. pp. 53. LL. (18.) to
2  (24.); pp. 53. (7.) to (8.). The following conversation took
3  place:
4  CALLES: Okay. Well you know what I'm going to ask you
5  right now to do, uh Ray...
6  PETITIONER: Yes sir.
7  CALLES: I want you to step over here in the corner for
8  a second, and let me make sure there's no scar down
9  there. Can you lift your stomach a little bit.
10 Okay. [I don't see - no scar.] (See Exhibit (B.) (which is
11 a page from the transcription of the videotape
12 recording). However - this is the testimony which
13 took place during the grand jury proceedings:
14 (Direct Exam)
15 MORDEN: Was Mr. Brown asked by another detective
16 to reveal his pubic area?
17 DARWIN: Yes he was.
18 MORDEN: And when he did that was the detective able
19 to observe a scar or something in that area?
20 DARWIN: When he asked to view the pubic area, and
21 undid his pants he first thought he saw a scar [This
22 testimony is perjured] and bent down to look. Ray
23 then took his fingers and rubbed them through his
24 pubic hair, and this 'line marking' - [This is false
25 evidence]... disappeared. There is a 'line' that is
26 horizontal on his lower abdomen just above his
27 penis that appears as a white line - [This testimo-
28 ny is perjured]... There is no scar, actual scar

1. MORDEN: Was this detective's description consistant
2. with the description given by Thorton?
3. DARWIN: Yes. — [This is perjured testimony].
4. It is relevant here that Calles did testify at trial
5. to seeing this linemarking 'in' the petitioner's
6. pubic hair which is as follows: (Direct Exam by
7. Racheal Mitchell)
8. Q. When he exposed his pubic hair to you did you
9. see anything?
10. CALLES: I 'immediately' noticed that there was a
11. linemarking right 'in' the pubic area, at which time
12. I asked Mr. Brown what that was, and he looked
13. down, and took and put his fingers into the hair
14. of his groin and mixed it up. What it turned out
15. to be was just a lining from the pubic hair.
16. Q. Okay. And after Mr. Brown had run his hands
17. through his pubic hair, was this linemarking still
18. visible?
19. CALLES: No it wasn't (see R.T. dated 10-28-98. pp. 87. LL.
20. (9.) to (25.) and pp. 88. LL. (1.) to (2.). Before his testimony
21. at trial Calles told this falsehood to the prosecutor
22. (I.d at pp. 90. LL (11). In the exchange of conversation
23. in the interrogation Calles 'does not' ask the petition-
24. er 'what that was', in reference to finding this line-
25. marking which is 'key' to the alleged action of the
26. petitioner — looking down, putting his fingers into
27. the hair of his groin and mixing it up and thus
28. making this linemarking disappear.

1. DARWIN WAS AWARE OF this fact - where she was in
2. another room 'listening' to the CONVERSATION BETWEEN
3. CALLES and the petitioner but yet elected to give
4. FALSESWORN testimony to the GRAND JURY about a
5. linemarking - (SEE Proceedings Before the 199th
6. MARICOPA GRAND JURY; dated 12-12-96. pp. 13. and pp.
7. 14. LL. (1.) to (6.). The prosecution knew that the
8. testimony given at both GRAND JURY and trial
9. JURY concerning the issue of the SCAR was PERJURED
10. where the video tape of the interrogation by
11. CALLES was entered at trial by "Racheal mitchell"
12. as "Exhibit No. 15", which was shown to the trial
13. JURY (Id. at pp. 91. LL. (8.) to (25.) and pp. 93. LL. (1.)
14. to (9.). And both prosecutors were in possession of
15. both audio and video tapes of the interrogation
16. of the petitioner by CALLES 'before' any proceedings
17. was initiated against the petitioner that CALLES had not
18. had not found a SCAR or linemarking on the petitioner.
19. (SEE Exhibit (C.) (which is a 'discloser list') and
20. thus in full knowlege that the testimony given
21. at the 'GRAND JURY' was PERJURED and committed
22. no action in correcting the perjured testimon-
23. y but rather allowed it to occur. The perjured
24. testimony is material where it "linked" the petitioner
25. to Thorton's story of having been raped by him.
26. The GRAND JURY, in accepting the perjured testimony
27. as the TRUTH found causation that exsisted that the
28. petitioner committed the crimes and held him

1. to answer for crimes HE DID NOT COMMIT against
2. Thorton by indicting him.
3.
4. COUNT (2.)
5. FACTS
6. Thorton claimed that the petitioner consumated an act
7. of oral sexual intercourse when the petitioner pushed her
8. down on the bed, got on top of her, used one hand to
9. hold both of her hands down on the bed above her
10. head, then lifted her leg[s] pinned her knee[s] against
11. his [chest] lowered his head and began licking her
12. vagina (see Exhibit (D.) which is the description of the
13. oral sex act Thorton gave to police. It is submitted
14. here that the 'oral' sex act' given by Thorton (in its
15. consumation) is in fact 'PHYSICALLY IMPOSSIBLE'
16. where 'oral sexual contact is effectively prevented', where
17. Thorton's legs would be held 'closed' by the pinning
18. of her knees against the petitioner's chest - Thorton
19. testified that this act was consumated by this
20. description (see R.T. dated 10-27-98. 9:35 am. pp. 139. LL.
21. (12.) to (28.), and pp. 140. LL. (1.) to (25.) - The jury in hearing
22. Thorton's testimony should have been well satisfied that
23. Thorton 'willfully' misstated the circumstances of the
24. act, and in effect discredited her 'entire story' of
25. having been raped by the petitioner; where the physically
26. impossible oral sex act would have made 'her story
27. unbelievable'. - Yet the petitioner was still found
28. guilty...

COUNT (3.)

FACTS

Another issue at trial that is related to the issue with the scar is the issue of a knife being used to make Thorton submit to sexual intercourse. Thorton's testimony concerning this issue is as follows:

(CROSS-EXAM (Thorton))

Q. You would agree with me that according to the "story" you gave to police, that there were several opportunities for you to get away?

A. Yes.

Q. Like one time he offered you the knife and you turned it down, correct?

A. No. He offered me the knife but he didn't give it to me.

Q. You said you didn't want the knife.

A. I remember him asking me did I --- (HESITATION) I asked him for the knife... [creating an inference that she would accept the knife and made a get away] But I remember him not giving it to me [showing the requisite intent for sexual assault (rape) by intentionally knowingly in sexual intercourse without consent of the other person - see Arizona Revised Statues 13-1406 - and a culpable mental state of the petitioner that he planned to use the knife to engage in sexual intercourse with her and without her consent and thereby preventing her resistance or escape. (See R.T. dated 10-27-98. pp. 165. LL. (5.) to (25.) - It is submitted here that when Thorton first reported her story to police - she stated when

1. when she and the petitioner came back to the bedroom-
2. the petitioner came over, sat the knife down on the dresser,
3. and sat next to her and subsequently ask her - "did
4. she want the knife". See Exhibit (D.), paragraph (4.)
5. Thorton was in agreement with the "story", she told to
6. police, which in effect shown she had consented to
7. sexual intercourse - where she did not accept the knife
8. when offered, to resist the sexual intercourse from
9. occurring - which as a [rule] the female must resist
10. to her "utmost" ability or it is not rape (see 75. C.J.S.
11. Rape Section (4.) - Here; according to Thorton's
12. story to police - she "merely" had to accept the knife
13. when offered to resist the sexual intercourse - However,
14. Thorton "concealed", that she had "consented" to sexual
15. intercourse by giving perjured testimony to the jury
16. as the truth, that she told "police" that she asked for the
17. knife but was refused. The prosecution was in knowled-
18. ge that Thorton was giving perjured testimony to the
19. jury where the prosecution had Thorton's statements
20. to police concerning that part of her testimony
21. (see again Exhibit (C.)(discloser list) yet elected not
22. to correct her - Thorton's perjured testimony was
23. "material" in establishing the statutory elements of the
24. crime of sexual assault and the culpable mental state
25. thereof, thus acquiring a verdict of guilt against
26. the petitioner.
27.
28.

COUNT (4.)

FACTS

The petitioner submits here that the evidence of the video tape (exhibit No.15) as stated in COUNT (1.) and the physically impossible oral sex act as stated in COUNT (2.) should have exculpated the petitioner, the causation for this is apparent where a prior act case was admitted at trial against the petitioner to show he committed the offenses in the Thorton case. The testimony was given by a Earlene Marie Hillman-Ross (hereinafter Ross), which was "perjured", "sordid", and highly prejudicial as to have the jury ignore the exculpatory evidence in count (1.) and count (2.). Ross's testified that the petitioner had made her submit to sexual intercourse by threating to cut her throat with a knife. Ross's testimony is as follows:

(Direct Exam)

Q. During this entire time you were actively resisting?
A. Yes.
Q. How were you doing that?
A. By fighting as I stated earlier, I hit him with an iron and I'm screaming.
Q. At some point was there a weapon introduced into this?
A. Yes.
Q. Tell us about that?
A. Kitchen knife from the kitchen.
Q. From your kitchen?
A. Yes.
Q. Where were you when he left to get the knife?

1. A. On the bed.
2. Q. Did you get off the bed during that time?
3. A. Yes.
4. Q. What did you do?
5. A. Went towards the door.
6. Q. What happened when you went towards the door?
7. A. He put the knife up to my neck, he did'nt break any
8. skin, he just told me to shut up, you know, be --- or
9. you know, I'll cut you.
10. Q. Did any sort of sexual acts occure after the
11. situation with the knife being placed at your throat?
12. A. Intercourse. (See R.T. dated 10-28-98. 10:00 AM
13. pp. 38, LL. (24.) to (25.), and pp. 39 to 40, LL. (1.) to (7.)
14. Ross's perjured testimony was also 'sordid' where
15. she testified that while the sexual intercourse
16. was occuring with the knife at her throat, the
17. petitioner made the statement "It is too bad your two-year
18. -old daughter is'nt here". (Creating an inference that the
19. petitioner would have tortured her two-year-old
20. daughter by making her watch while her mother
21. was being raped - or aimed some sort of sexual
22. misconduct towards the two-year-old)(Id. at pp.
23. 33.). The police investigation that was conducted
24. in the Ross incident reveals that no knife was
25. used in the commission of the offense nor was
26. there any mention that Ross had a two-year-
27. old daughter at the time of the alleged offense
28.

1. (SEE EXHIBIT (E.) Which is the original and supplemental reports
2. conducted in the Ross incident.) - MORESO is the 404(c)
3. hearing conducted in permitting the Ross case
4. against the petitioner. The police investigation of the
5. 'Ross incident' and the 'Thorton incident' was used
6. in a comparable measure to ascertain the 'salient
7. similarities' and 'salient dissimilarities' between
8. the two incidents as to permit or not permit the
9. Ross incident against the petitioner. Notably missing
10. is a 'knife' being used in the Thorton or Ross incident,
11. as a salient similarity - nor a 'child', in the manner
12. in which Ross testified to as a salient similarity -
13. (SEE R.T. dated 10-26-98. pp. 74. LL. (18.) to (25.); pp. 75, 76,
14. 77, and 78, LL. (1.) to (7.). As such the prosecution was in
15. full knowledge that Ross was giving perjured
16. testimony to the jury and took no steps to correct
17. the perjured testimony by Ross. One circuit
18. court wrote: " When jurors hear that a defendant has on
19. earlier occassions committed essentially the same crime
20. as that for which he is on trial, the information unquestion-
21. ably has a 'powerful and prejudicial impact.' (That of
22. course, is why the prosecution uses such evidence when-
23. ever it can.) When prior acts evidence is introduced, regard
24. -less of the stated purpose, the likelyhood is very great
25. that the jurors will use the evidence precisely it may not be
26. considered; to suggest that the defendant is a bad person,
27. and that if he did it before he probably did it again.'"
28. United States v. Johnson, 27 F.3d 1186, 1193 (6th Cir. 1994)

1 - which holds true here - where the prejudicial impact from
2 the prior act is 'magnified' by 'perjury'.
3
4         COUNT (5.)
5 FACTS
6 A complaining witness - Shamika Jackson (hereinafter-
7 Jackson), concerning consumated acts of oral and penile,
8 sexual-intercourse- having claimed the petitioner raped her.
9 Jackson's statements to police when questioned about the
10 oral and penile-vaginal sexual intercourse Jackson explain-
11 ed, that the petitioner put his tongue inside her vagina
12 'first', (see Exhibit (F.) paragraph (3.); lines (7.), (8.) and (9.);
13 then the petitioner put his penis inside her vagina (Id. at
14 paragraph (4.) lines (1.) and (2.). Blood and semen
15 stains were found on the sheet of the bed where the
16 alleged sexual intercourse occurred. It was alleged by
17 the prosecution that the blood stains was due to Jackson's
18 hymen being torn from the result of sexual intercourse-
19 where it was found through a medical examination that
20 Jackson had a 'healed hymen tear' - which was used by
21 the prosecution along with Jackson's accusations to
22 prove that the petitioner had sexual intercourse with
23 Jackson, amounting to the offense of rape. - D.N.A.
24 testing was conducted on the blood and semen stains.
25 The blood stains were consistant with Jackson's
26 D.N.A. profile and contained another D.N.A. profile
27 that the petitioner was 'excluded', as being the source
28 of that 'D.N.A. material' (see R.T. $ 26-98, pp. 60. LL. (7.) to (25.)

1. and pp. 44, LL. (11) to (19.) - Coupled with this is the D.N.A. Expert
2. testimony when questioned about what could "cause"
3. a 'mixed' sample of D.N.A. - which is as follows:
4. (Direct Exam - D.N.A. Expert Kathleen Saxtor.)
5. Q. Okay in a normal sexual encounter --- let me define that -
6. -- where a man puts his penis inside of a woman's vagina
7. and ejaculates inside the vagina --- okay would you in 'test-
8. ing' the fluid (secretions) that flows out of the vagina
9. after post ejaculation, would you expect that to be a
10. mixture of sample?
11. A. Yes. I would expect to see an "epithial" contribution
12. from the "woman", and a semen contribution from
13. the man.
14. Q. The "epithial" contribution would be the woman's vaginal
15. canal, basically the skin cells on the vaginal canal being
16. slough off right?
17. A. Correct. (See R.T. dated 10-26-98. pp. 55. LL. (6.) to (18.)
18. (Likewise, Kathleen Saxtor on Cross-Exam.
19. Q. Hello Ms. Saxtor. I would like to ask you a question
20. first concerning mixed samples of D.N.A., "what could
21. cause" D.N.A. samples to have the D.N.A. from two people
22. in the same bodily fluid (secretion) stain?
23. A. There are many things that could cause that in "vaginal
24. intercourse." You could have "vaginal fluid (epithial
25. secretion) and semen in the same stain. In "oral
26. sexual intercourse" you could have "saliva" and
27. semen in the same stain. (Id. at pp. 57. LL. (23) to (26.) and
28. pp. 58. LL. (1.) to (7.). The petitioner submits here that the

1. prosecution had the D.N.A. report in it's possession before
2. trial (see Exhibit(6.) which is the second page of the D.N.A
3. testing results) and Document (27.) State's Motion in Support
4. of the Admission of D.N.A. Evidence - (dated March 14, 1997).
5. The petitioner further 'submits', that according to the test
6. results on the blood stain from Jackson's hymen tear it does
7. not contain a mixture of sample of vaginal fluid (epithial)
8. nor 'saliva' - In considering the D.N.A. expert's testimony
9. concerning causations of 'mixed' samples of D.N.A. would
10. have been apparent to the prosecution at this time that "no
11. oral or penile-vaginal sexual intercourse" occured
12. between the petitioner and Jackson and that [any]
13. testimony that was given by Jackson concerning
14. the consumated sexual acts committed upon her
15. was 'falseswurn' - yet the prosecution did not act at
16. anytime to [correct] Jackson's perjured testimony.

# REASON WHY THIS COURT SHOULD ISSUE THE WRIT OF MANDAMUS

THE MERRIAM-WEBSTER-DICTIONARY of LAW defines the writ of mandamus as an extraordinary writ issued by a court of compent jurisdiction to an inferior tribunal, a public official, an administrative agency, a corporation or any person compelling the performance of an act usu. only when (1.) there is a duty under law to perform the act. - (2.) the plaintiff has a clear right to such performance - (3.) and there is no other adequate remedy available. ♦ MANDAMUS is an extraordinary writ and is issued usu. only to command the performance of a [ministerial act] - That being or having the characteristics of an act or 'duty' prescribed by Law is part of the duties of an administrative office and (2.) Relating to or being an act done 'after' ascertaining the existance of a 'specified state of facts', in obedience to legal and esp. statutory mandate without exercise of personal judgment or discretion - Accordingly; The prosecutions 'duty' in a criminal prosecution is to seek justice (BERGER V. U.S., 295 U.S. 78, 88 (1935) - The petitioner has shown in each one of the [counts] of perjury committed that the prosecution was in knowledge that the petitioner was innocent to the extent he had not, committed an offense, but instead adhearing to it's 'duty' to seek justice - the prosecution sought an 'injustice' by

(16.) of (19.)

1. allowing criminal acts of perjury to acquire an indict-
2. ment and a verdict against the petitioner. SEE ARIZONA
3. REVISED STATUTE (A.R.S. 13-2702. PERJURY; classification.)
4. providing: (A) A person commits perjury by making by
5. making false sworn statements in regards to a "material issue"
6. believeing it to be false. material issue means that which
7. would have affected the course or outcome of any
8. proceedings or transaction whether a statement is material
9. in any factual situation is a question of "law", and [8 U.S.C.
10. - section 1622]. subornation of perjury: Whoever procures
11. another to commit any perjury is guilty of subornation
12. of perjury, and shall be fined under this title or imprison-
13. ed not more than five years or both". The Supreme Court
14. noted concern in SHLUP V. DELO about the injustice that
15. results from the conviction of a innocent person. When
16. the court wrote: The concern is reflected, for example,
17. "in the "Fundamental value determination of our society that
18. it is far worse to convict an innocent man", than to let
19. a guilty man go free". (The maxim of the law is ...
20. that it is better that ninety-nine ... offenders should
21. escape, than one innocent man should be condemned.
22. (Shlup V. DELO 513 U.S. 298. at [*325]. The petitioner
23. submits here that (1.) under due process of law the
24. prosecution has a 'duty' in performance to 'correct'
25. false sworn testimony. The U.S. Supreme Court in
26. NAPUE V. ILLINOIS, 360 U.S. 264. Established that a
27. obtained through use of false evidence, known to be such
28. by representative of the state, must fall under the Fourteenth

Amendment (citations omitted)(NAPUE, at page 360 U.S. 269). and placed a 'duty' on those representative of the State to correct such false sworn testimony - when the Court wrote (in part) A lie is a lie, no matter what it's subject, and if it is in any relevant to the case, the district attorney has the 'responsibility' and 'duty' to 'correct', what he knows to be false and elicit the truth (NAPUE, at page 360 U.S. 270.). (2.) The due process of law of law is a 'guaranteed' right for the petitioner - given under the 5th and 14th Amendments of the United States Constitution, as such the petitioner has a clear right to such a performance by the Attorney General [in the duty to 'correct' the perjured testimony in CR. 96-1182.] (3.) The petitioner submits here that under the Prosecutor Code of Ethics - Rule 3.8 Section (H.) (Special Responsibilities of the Prosecutor) - comports with the 5th and 14th Amendments Due Process of law which provides: The prosecutor in a criminal case shall: section (H) when a prosecuter 'knows' of clear and convincing evidence establishing that a defendant in the prosecutor's jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor 'shall' take appropriate 'steps'... to set aside the conviction - The comment to this section is more profound - and comports with that 'concern' of the U.S. Supreme Court in SHULLUP V. DELO (maxim of the law) - in which it states: A prosecutor has a responsibility of a 'minister' of justice and not simply that of an

1. advocate. This responsibility carries with it specific
2. obligations to 'see' that the defendant accorded
3. 'procedural justice', that guilt is decided upon the
4. the basis of sufficient evidence and that 'special
5. precautions' are taken to prevent and 'rectify' the
6. conviction of [innocent persons]. However it is unfounded
7. by the petitioner whereby rule to 'invoke' this provision as a
8. corrective process in this 'case', and [thus no adequate
9. remedy] - except through the writ of mandamus - This writ
10. would act to enforce the provisions of Rule 3.8 - when
11. issued, would compel the attorney general or his offic-
12. ers to act in performance of their duty to correct the
13. perjury in compliance with due process of law - which
14. would result in an 'extrication' of the perjury and
15. 'effect' a showing that the petitioner did not or had not
16. committed any crime, to the extent that he is 'innocent'
17. - [where only through perjury can it be shown that the
18. petitioner committed the crimes.] - This knowledge
19. would bring into fruition to the State, where those
20. 'special precautions' under the provisions of Rule 3.8
21. would be employed in a 'procedural-just' manner to
22. rectify the convictions of the petitioner - [thus
23. creating a correct process though the writ of manda-
24. mus.
25. WHEREFORE NOW, above premises considered, the petitioner
26. moves this Honorable Court to issue a writ of mandam-
27. us to command the attorney general or his prosecuting
28. officers in a performance of a duty to correct the

(18.) & (19.)

1  PERJURY IN THE COUNTS PRESENTED HEREIN IN ACCORDANCE
2  WITH DUE PROCESS OF LAW - WHERE THE RIGHT TO DUE PROC-
3  ESS OF LAW IS GUARANTEED TO THE PETITIONER BY THE
4  UNITED STATES CONSTITUTION, AND HIS RIGHT TO SUCH
5  PERFORMANCE IS "CLEAR AND UNDISPUTABLE" UNDER DUE-
6  PROCESS OF LAW.
7
8           DONE this 3rd day of MAY, 2019
9           Respectfully submitted by
10          Ray Maurice Brown
11          Ray Maurice Brown - Pro se (50996)
12          Arizona State Prison
13          P.O. Box 8400
14          Florence, Arizona 85132
15
16  Original and (1.) copy of the
17  foregoing petition, mailed
18  this 3rd day of May, 2019, to:
19
20  CLERK, UNITED STATES DISTRICT COURT
21  SANDRA DAY O'CONNOR U.S. COURTHOUSE, SUITE 130
22  401 W. WASHINGTON ST., SPC (ONE)